TAYLOR, C.J.
In this case, the Court is called on to examine the doctrine of “lost opportunity” set forth in MCL 600.2912a(2), which prohibits recovery for the loss of an opportunity to survive or achieve a better result unless the opportunity was greater than 50 percent, and the construction of that statute in Fulton v William Beaumont Hosp, 253 Mich App 70; 655 NW2d 569 (2002). The Court of Appeals in this case considered the aggregate of complications plaintiff faced and concluded that plaintiff satisfied the statute, using Fulton’s requirement that the difference between his chance of a better result without malpractice and his chance of a better result despite the alleged malpractice was greater than 50 percentage points. I conclude that the second sentence of MCL 600.2912a(2) does not apply to this case. Moreover, I believe the second sentence is unenforceable because it provides no guidance regarding its meaning or how courts are to apply it. A medical-malpractice plaintiff must prove that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant. Because the evidence presented at trial would support the jury’s verdict under my analysis, I conclude that there is no need to conduct a new trial and would therefore affirm the result of the Court of Appeals judgment but not its analysis.
I. FACTS AND PROCEEDINGS
Plaintiff suffered the rupture of an abdominal aortic aneurysm that had gone undetected despite physical examinations and testing by a number of physicians.[1] *148 He underwent emergency surgery to repair the rupture, but, in part because of preexisting conditions, amputation of both legs at mid-thigh was ultimately necessary. After surgery, plaintiff continued to experience multiple organ failure and other complications, including acute renal failure, sepsis, rhabdomyolysis, osteomyelitis, recurrent pancreatitis, and depression. His home required structural changes to accommodate his wheelchair and specialized needs, and his wife quit her employment to assist with his daily care needs.
Plaintiff brought a medical-malpractice suit against the radiologist and two vicariously liable entities on the theory that a negligent diagnosis resulted in the rupture and all resulting harm. At the jury trial, plaintiff presented experts who testified that, had the aneurysm been properly diagnosed, elective surgery could have been performed. Such elective surgery would have greatly increased plaintiffs chance of a better medical outcome, including a reduction of the risk of amputation and other health complications. Plaintiffs medical experts testified that a patient having elective surgery to repair an aortic aneurysm has a 95 percent chance of attaining a good result, which includes surviving the rupture, as well as avoiding additional medical complications. In contrast, misdiagnosed patients whose aneurysms rupture have only a 10 percent chance to achieve a good result. Specifically, the experts opined that 80 percent of patients with a rupture of an aortic aneurysm die, either en route to obtain medical care or during the emergency surgery. Of the 20 percent of patients with ruptures who manage to survive, 40 to 50 percent have some form of complication. This contrasts markedly with those undergoing elective repair, who face less than a 5 percent risk of dying or suffering serious complications.
*149 Defendants argued that the risk of death should be factored out because plaintiff avoided it and that the risk of complications other than death was 5 to 12 percent for elective surgery and up to 40 percent for emergency surgery. Taking the numbers most favorable to plaintiff, 5 and 40, defendants argued that the difference was at best 35 percent. The specific risk of amputation suffered by plaintiff was 1 percent for elective surgery and 5 percent for emergency surgery: a paltry difference of 4 percent. The trial court disagreed with defendants’ theory, however, and instructed the jury to consider the aggregate risk of complications.
The jury returned a verdict in favor of plaintiff for a total amount of $2,327,835. Following reduction for the damages cap[2] and collateral sources, the court entered a judgment in the amount of $1,936,682, of which $1,640,800 was for the verdict and the remainder was for interest, costs, and attorney fees. The trial court denied defendants’ postjudgment motions for a new trial and judgment notwithstanding the verdict.
The Court of Appeals affirmed in an unpublished opinion per curiam, issued April 17, 2007 (Docket No. 265048). On the issue of “loss of opportunity,” it agreed with the trial court that plaintiff had met the requirements of the statute because he had gone from a 95 percent chance of attaining a good result to a 10 percent chance of attaining a good result. Id. at 5. The Court considered the aggregate of all the increased risks that plaintiff faced as a result of the alleged malpractice and applied the Fulton formula to that aggregate risk.
This Court granted leave to appeal, directing the parties to address
*150 (1) whether the requirements set forth in the second sentence of MCL 600.2912a(2) apply in this case; (2) if so, whether the “loss of an opportunity to survive or an opportunity to achieve a better result” should be determined by considering the aggregate increased risk posed by the alleged malpractice, including risks associated with injuries that the patient did not suffer and any increased risk of death, or whether the only consideration should be the increased risk of the specific injury or injuries suffered by the patient; (3) whether Fulton v William Beaumont Hosp, 253 Mich App 70 (2002), was correctly decided, or whether a different approach is required to correctly implement the second sentence of § 2912a(2), such as that described in Roy W Waddell, M.D.’s A Doctor’s View of Opportunity to Survive: Fulton’s Assumptions and Math are Wrong, published in the March 2007 edition of the Michigan Bar Journal at 32; and (4) whether the Court of Appeals erred when it determined that the plaintiffs met the requirements of § 2912a(2). [480 Mich 895 (2007).]
II. STANDARD OP REVIEW
This Court reviews de novo a trial court’s decision on a motion for judgment notwithstanding the verdict, viewing the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Sniecinski v Blue Cross & Blue Shield of Michigan, 469 Mich 124, 131; 666 NW2d 186 (2003). Similarly, we review de novo questions of statutory interpretation. Wickens v Oakwood Healthcare Sys, 465 Mich 53, 59; 631 NW2d 686 (2001). When interpreting a statute, the Court’s primary goal is to give effect to the intent of the Legislature. Brown v Detroit Mayor, 478 Mich 589, 593; 734 NW2d 514 (2007). The first step is to review the language of the statute. Id. If the statute is unambiguous on its face, we presume that the Legislature intended the meaning expressed, and judicial construction is neither required nor permissible. Id. However, when a statute is ambiguous on its face — that is, equally *151 susceptible to more than a single meaning — judicial construction is appropriate to determine the meaning. Lansing Mayor v Pub Service Comm, 470 Mich 154, 164-166; 680 NW2d 840 (2004).
III. ANALYSIS
At issue in this case is subsection 2 of MCL 600.2912a, which reads:
In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. [MCL 600.2912a(2).][3]
Although the lower courts did not question the applicability of the second sentence of MCL 600.2912a(2) to plaintiffs claim, treating it as one for loss of opportunity, this Court expressly requested the parties to address the issue. Plaintiff argues that he never pleaded his claim as one for loss of an opportunity; instead, his is a simple case of physical injury directly caused by negligence. In his brief, he asserts that a case involving a loss of opportunity occurs in very specific circumstances: “where a plaintiff cannot prove that the defendant’s acts or omissions proximately caused his injuries, but can prove that the defendant’s acts or omissions deprived him of some chance to avoid those injuries.”
*152 This definition is in accord with Michigan caselaw. In the first Michigan case to refer to the legal theory of “the value of lost chance,” the Court of Appeals explained: “This theory is potentially available in situations where a plaintiff cannot prove that a defendant’s actions were the cause of his injuries, but can prove that the defendant’s actions deprived him of a chance to avoid those injuries.” Vitale v Reddy, 150 Mich App 492, 502; 389 NW2d 456 (1986). The Court in Vitale noted that allowing such claims would expand existing common law, and it declined to do so, stating that such a decision “is best left to either the Supreme Court or the Legislature.” Id. at 504. In a footnote, the Court observed that the wrongful-death statute, MCL 600.2922,
requires proof that the wrongful acts or omissions were the cause of death. The statutory provision would not allow a plaintiff to recover in a situation where he could prove only that defendant’s acts or omissions were the cause of a lost chance but could not prove that defendant’s acts or omissions were the cause of death. [Id. at 504 n 4.]
In accord with this analysis, this Court has stated: “The lost opportunity doctrine allows a plaintiff to recover when the defendant’s negligence possibly, i.e., [by] a probability of fifty percent or less, caused the plaintiffs injury.” Weymers v Khera, 454 Mich 639, 648; 563 NW2d 647 (1997) (emphasis added).[4] The Weymers Court aptly described the lost-opportunity doctrine as “the antithesis of proximate cause.” Id.[5] In cases in *153 which the plaintiff alleges that the defendant’s negligence more probably than not caused the injury, the claim is one of simple medical malpractice. Id. at 647-648.
In Falcon v Mem Hosp, 436 Mich 443; 462 NW2d 44 (1990), this Court first recognized a claim for lost opportunity to survive. Falcon was a wrongful-death case in which this Court allowed a claim to go forward even though the plaintiffs granddaughter would have had only a 37.5 percent chance of surviving a medical accident had she received proper care. Because proper medical procedures had not been followed, the granddaughter’s chance of surviving the accident went to essentially zero. The lead opinion in Falcon admitted that the plaintiff could not show that the malpractice had more likely than not caused her granddaughter’s death, but could show that it had caused her granddaughter to lose a “substantial opportunity of avoiding physical harm.” Id. at 470 (LEVIN, J.). The lead opinion disavowed the traditional rule that requires a plaintiff to show that, but for the defendant’s negligence, the patient would not have suffered the physical harm, saying that the “more probable than not standard, as well as other standards of causation, are analytic devices — tools to be used in making causation judgments.” Id. at 451. Instead, despite the fact that the plaintiff could not show that the doctor’s malpractice had more probably than not caused her granddaughter’s death, the plaintiff had a claim because the malpractice did cause her granddaughter harm. The 37.5 percent chance for a better outcome was “hardly the kind of opportunity that any of us would willingly allow *154 our health care providers to ignore.” Id. at 460. This harm occurred before the granddaughter’s death, at the moment “[w]hen, by reason of the failure to implement [certain] procedures,” she was denied any opportunity of living. Id. at 469, 471 n 44. The lead opinion characterized its holding as requiring the plaintiff to show, more probably than not, that the malpractice reduced the opportunity of avoiding harm: “failure to protect [the granddaughter’s] opportunity of living.”[6] Id. at 469. Loss of her 37.5 percent opportunity of living, the lead opinion stated, “constitutes a loss of a substantial opportunity of avoiding physical harm.” Id. at 470.
The lead opinion in Falcon thus concluded that the loss-of-opportunity claim accrued not when the patient died, but at the moment she went from having a 37.5 chance of survival to having no chance of survival. Under this theory, a plaintiff would have a cause of action independent of that for the physical injury and could recover for the malpractice that caused the plaintiff to go from a class of patients having a “good chance” to one having a “bad chance.” Without this analysis, the plaintiff in Falcon would not have had . a viable claim because it could not have been shown that the defendant more probably than not caused the physical injury. Until Falcon, medical-malpractice plaintiffs alleging that the defendant’s act or omission hastened or worsened the injury (such as by failing to diagnose a condition) had to prove that the defendant’s malprac *155 tice more probably than not was the proximate cause of the injury. See, e.g., Morgan v Taylor, 434 Mich 180; 451 NW2d 852 (1990); Naccarato v Grob, 384 Mich 248, 252; 180 NW2d 788 (1970); Skeffington v Bradley, 366 Mich 552; 115 NW2d 303 (1962).
When the Court decided Falcon, MCL 600.2912a read:
In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
Three years after Falcon, the Legislature enacted 1993 PA 78, amending MCL 600.2912a to add the second subsection. In its entirety, the statute as amended reads:
(1) Subject to subsection (2), in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as *156 a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
(2) In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. [New language emphasized.]
As can be seen, the Legislature retained the already-existing language, making it subsection 1 of the statute. Both subsection 1(a) and subsection 1(b) require the plaintiff to show that, “as a proximate result of the defendant failing to provide [the appropriate standard of practice or care], the plaintiff suffered an injury.” Further, the Legislature added subsection 2. Specifically, the first sentence of this new subsection codifies and reiterates the common-law requirement that a plaintiff show that the defendant’s malpractice more probably than not caused the plaintiffs injury. The second sentence of subsection 2 adds that, in medical-malpractice cases, a “plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.” However, one must keep in mind that the relevant caselaw when subsection 2 was enacted held that the lost-opportunity doctrine applies “in situations where a plaintiff cannot prove that a defendant’s actions were the cause of his injuries . . . .” Vitale, supra at 502 *157 (emphasis added). That is, the first sentence of subsection 2 requires plaintiffs in every medical-malpractice case to show the defendant’s malpractice proximately caused the injury while, at the same time, the second sentence refers to cases in which such proof not only is unnecessary, but is impossible. Accordingly, I conclude that the two sentences of subsection 2 create a paradox, allowing claims in the second sentence while precluding them by the first sentence.
While it is tempting to argue, as Justice CAVANAGH does, that the Legislature intended to allow as an “injury” a plaintiffs lost chance alone, without proof of physical injury, this Court addressed that issue in Wickens. In Wickens, supra at 60, the Court stated that the first sentence of subsection 2 “expressly limits recovery to injuries that have already been suffered and more probably than not were caused by the defendant’s malpractice.” A reduction of a person’s chances of avoiding injury is not itself a present injury, but is only an indication of the likelihood of suffering a future injury. Id. at 60-61. Therefore, because of the statutory present-injury requirement, the plaintiff in Wickens could not recover for her reduced expected life span— the exact kind of injury that Falcon allowed. Moreover, it has never been the law in this state that a negligence suit can be sustained when the alleged negligence did not cause a physical injury to a person or property. Henry v Dow Chem Co, 473 Mich 63, 75-76; 701 NW2d 684 (2005). The Legislature would have understood that this is what the term “injury” encompassed when it enacted the language reiterating this traditional requirement: the plaintiff must have an injury proximately caused by the defendant.[7] Ford Motor Co v City *158 of Woodhaven, 475 Mich 425, 439-440; 716 NW2d 247 (2006). Thus, what the Legislature intended by the statute was likely something more traditional: a situation in which an injury might have occurred anyway, but in which the defendant’s act or omission hastened or worsened it in such a way that the plaintiff suffered more severe physical injury than he or she would have had the negligence not occurred. As noted, before Falcon, such cases were litigated under the ambit of traditional medical-malpractice law.[8]
In my view, there is little question that the statute cannot be interpreted as written. Avoiding the underlying paradox of the statute allowing in one sentence suits that in another sentence it precludes, the Court of *159 Appeals, interpreting the second sentence by itself in Fulton, found two possible, and fully contradictory, constructions, each of which could be achieved only by adding words to the statute. The Fulton Court expressed the issue before it as whether the second sentence of the statute requires a plaintiff to show “only that the initial opportunity to survive before the alleged malpractice was greater than fifty percent... or, instead, that the opportunity to survive was reduced by greater than fifty percent because of the alleged malpractice ....” Fulton, supra at 77-78 (emphasis added). The Court noted that the statute was ambiguous because reasonable minds could differ regarding which of these meanings could be read from the words of the statute. The Court concluded that the first interpretation required that the word “initial” be inferred to modify “opportunity” and that the second required that the words “loss of” be inferred to modify “opportunity.” Id. at 80. Apparently finding itself obligated to choose one of these two interpretations, the Court then decided that the second construction was the one intended by the Legislature because it reflected the Legislature’s rejection of Falcon.[9] The Court asserted that the lead opinion in Falcon had focused on the “extent of the loss” and that the Legislature was insisting on a greater loss for the claim to be actionable. Id. at 82-83. However, Falcon’s focus was almost entirely on the plaintiffs initial opportunity being substantial, and so it is equally plausible that the Legislature merely intended for a plaintiff to have an initial opportunity of more *160 than 50 percent. Both interpretations proposed in Fulton implicate a negative reaction to Falcon, and nothing in the statutory language, the statutory context, or the statute’s history gives any further clues to assist in choosing the “correct” interpretation.
It is confounding to attempt to ascertain just what the Legislature was trying to do with this amendment. Even if it was trying to create a remedy for the “injury” of a reduction in chances following medical malpractice, by imposing the threshold of greater than 50 percent it may well have eliminated most of the cases that might benefit from such a rule. For example, if the patient in Falcon had enjoyed a greater than 50 percent initial likelihood of survival (that is, she was not likely to die even with proper treatment), the plaintiff probably would have brought a standard medical-malpractice case, and the jury would have decided proximate cause in the usual way. It was only because the plaintiff could not show that the patient more probably than not would have survived but for the doctor’s negligence that prompted the plaintiff to seek her remedy under the doctrine of lost opportunity.
As written, the second sentence of MCL 600.2912a(2) can be made understandable only by adding words or by redefining “injury” in a way significantly contrary to the mass of caselaw at the time the sentence was added. Another possible alternative reading is that the second sentence of subsection 2 was intended not to create a new type of claim, but to limit courts from expanding the common law so far as to allow cases like Falcon. None of these multiple, contradictory interpretations can be shown to be the “correct” construction of legislative intent. Choosing between them can only be a guess. Moreover, it remains that the second sentence impossibly conflicts with the requirement of a proxi *161 mate cause of the injury in both the first sentence of subsection 2 and in subsection 1. Accordingly, I conclude that the second sentence of subsection 2 cannot be judicially enforced because doing so requires the Court to impose its own prerogative on an act of the Legislature.[10]
I find the second sentence of MCL 600.2912a(2), as written, substantially incomprehensible because (1) it either cannot be harmonized with the proximate-cause requirement of the rest of the statute or creates by implication a new cause of action contrary to common law and (2) it provides no guidance regarding its correct application. The remaining portions of MCL 600.2912a should continue in effect. MCL 8.5.
This would leave, for medical-malpractice claims, the requirement imposed by the statute that “the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants.” MCL 600.2912a(2).[11] In addition, the word “injury” would continue to retain its meaning in tort of a present physical injury to person or property. I believe that, by codifying and restating the requirements of causation and injury in existence at the time Falcon was decided, the Legislature effectively overruled Falcon and reinstated the traditional elements of medical-malpractice claims.
*162 In accord with my conclusion that the second sentence of MCL 600.2912a(2) is incomprehensible as written, I would hold that Fulton’s construction of that part of the statute is no longer good law.[12]1 believe that the Legislature intended to retain the traditional proximate-cause requirement in effect before Falcon and that that is what a plaintiff must prove.[13]
IV APPLICATION
Although I believe that the lower courts erred by applying Fulton and that the trial court incorrectly instructed the jury on the issue of whether plaintiff had shown that defendant’s negligence caused him to lose a greater than 50 percent chance of a better result, I would conclude that it is not necessary to order a new trial. For each defendant, the trial court instructed the jury that it had to find by a preponderance of the evidence (1) that the defendant was professionally negligent, (2) *163 that plaintiff sustained injury and damages, and (3) that the professional negligence or malpractice of that defendant was a proximate cause of the injury and damages. After giving these instructions, the court farther instructed the jury: “I’m going to talk about damages. In an action alleging claims of professional negligence against a physician, even if you find professional negligence, the Plaintiff cannot recover unless the Plaintiffs chance of having a better result was changed by greater than 50 percent.” Thus, after being instructed that it had to find the traditional elements of medical malpractice and, in addition, had to find that plaintiff had lost an opportunity of greater than 50 percent, the jury returned a verdict indicating it had found that all these elements were satisfied. Indeed, a review of the record shows that plaintiff suffered amputations and other injuries, and from the testimony presented the jury could have concluded that it was more likely than not that the amputations and other injuries were caused by the defendants’ negligence and would not have occurred absent that negligence. Most importantly, regardless of the jury’s finding of lost opportunity, it is clear from the way the instructions were given that the jury found that the traditional elements were met: defendants’ negligence more probably than not caused plaintiffs injuries. Thus, I believe that the jury properly found that plaintiff had satisfied the causation and injury elements. Accordingly, I would hold that reversal is not required and would affirm the result of the judgment of the Court of Appeals.
V SUMMARY
In an attempt to clarify for the reader the majority and minority positions on each issue, I provide the following summary:
*164 All seven justices would affirm the result of the Court of Appeals decision and the judgment for plaintiff. Six of the justices believe that this is not a lost-opportunity case; Justice MARKMAN would hold that it is such a case. All seven justices believe that Fulton’s analysis is incorrect or should be found to no longer be good law, though their reasons for doing so vary.[14] Justices CORRIGAN and YOUNG and I would find that Fulton is no longer good law because we would hold that the statute is unenforceable as written. Justice MARKMAN would hold that Fulton is inconsistent with the statutory language. Justices Weaver, Cavanagh, and Kelly would hold that Fulton is incorrect because it erroneously added words to the statute when analyzing the phrase “the opportunity.” Of the four justices holding that the statute is not unenforceable as written (Justices WEAVER, CAVANAGH, Kelly, and Markman), only Justice Markman would define the term “opportunity” in accordance with the Waddell article, while the other three (Justices WEAVER, CAVANAGH, and Kelly) would define it in accordance with Falcon, but with a higher threshold than Falcon required. The same four justices (Justices WEAVER, Cavanagh, Kelly, and Markman) would hold that loss of the opportunity is, by itself, a compensable injury, although the opportunity must be “lost” — that is, the bad result must occur — in order for a claim to accrue.
Given this montage of issues and positions created by the language of this statute, it would be helpful for the *165 Legislature to reexamine its goal and the policies it wishes to promote and strive to better articulate its intent in that regard.
Corrigan and Young, JJ., concurred with Taylor, C.J.
CAVANAGH, J. I agree with Chief Justice TAYLOR that the evidence presented in this case supports a traditional medical-malpractice claim; thus, I concur that the jury’s verdict should be upheld. However, I do not agree with the conclusion that the second sentence of MCL 600.2912a(2) is incomprehensible and unenforceable. Therefore, I respectfully disagree with Chief Justice TAYLOR’s analysis of that provision.
Chief Justice TAYLOR identifies two problems with MCL 600.2912a(2) that he believes render it partially unenforceable: (1) the first and second sentences conflict and (2) the second sentence is incomprehensible. I disagree, because the circumstances of the 1993 amendment of this statute clarify the meaning of the statutory language and resolve both concerns.
THE ORIGINS OF THE LOSS-OF-OPPORTUNITY DOCTRINE
The history of the loss-of-opportunity doctrine is highly relevant to the interpretation of MCL 600.2912a(2) because this Court’s adoption of the doctrine evidently prompted the Legislature to add that provision. In Falcon v Mem Hosp, 436 Mich 443; 462 NW2d 44 (1990), this Court first recognized the loss-of-opportunity doctrine.[1] Falcon involved a wrongful- *166 death claim brought on behalf of a woman who had suffered an amniotic embolism during childbirth. As in all negligence cases, the plaintiff was required to show causation to establish a valid medical-malpractice claim. Falcon discussed various causation theories. Some courts have required a plaintiff to establish “that it is more probable, measured as more than fifty percent, that, but for such negligence, the patient would not have suffered the physical harm.” Id. at 449 (LEVIN, J.). Falcon termed this the “more probable than not standard.” Id. at 451. Under this standard, “a plaintiff who establishes that the patient would have had more than a fifty percent opportunity of not suffering physical harm had the defendant not acted negligently, recovers one hundred percent of the damages.” Id. at 450. The plaintiff in Falcon could not have maintained a wrongful-death action under the more-probable-than-not standard — the decedent only had a 37.5 percent chance of surviving even without the alleged malpractice, so it was not more probable than not that the physician’s malpractice caused the decedent’s death. Id. at 460.
While the plaintiff in Falcon could not recover for the injury of her granddaughter’s wrongful death, we ruled that the plaintiff nevertheless had a different cause of action available to her. Falcon adopted the approach taken by other courts that recognized “loss of an opportunity for a more favorable result, as distinguished from the unfavorable result, as compensable in medical malpractice actions.” Id. at 461 (emphasis added). “Under this approach, damages are recoverable for the loss of opportunity although the opportunity lost *167 was less than even, and thus it was not more probable than not that the unfavorable result would or could have been avoided.” Id. at 461-462. Thus, the Falcon decision explicitly recognized loss of an opportunity to avoid physical harm as a distinct injury. A plaintiff could bring a claim for loss of an opportunity to avoid death, even if she could not maintain a claim for the death itself because she could not establish causation for the death.
Falcon’s approach to calculating damages for a loss-of-opportunity claim also indicates that it treated the lost opportunity as a distinct injury, not simply a direct physical-harm injury that enjoyed a lower causation standard. Because the plaintiffs granddaughter in Falcon allegedly lost a 37.5 percent chance of survival, we concluded that the appropriate measure of damages would be “37.5 percent times the damages recoverable for wrongful death. . . .” Id. at 471. Thus, generally speaking, “ ‘[t]he proper computation of damages would limit the damages recoverable to only that amount of reduced chance of recovery actually caused by the physician’s negligent conduct.’ ” Id. at 472 n 47 (citation omitted). We consulted Mays v United States, 608 F Supp 1476, 1482-1483 (D Colo, 1985), for its method of computing damages attributable to the defendant. Falcon, 436 Mich at 471-472 (LEVIN, J.). In Mays, malpractice had reduced the patient’s opportunity to survive from 40 to 15 percent, so the court computed the damages by multiplying the opportunity lost (40 minus 15) by the net pecuniary loss to determine the damages for the harm caused by the defendant. Id. Calculating the damages this way permitted the plaintiff “to recover damages only for the reduction in the patient’s opportunity of survival.” Id. at 472. This calculation isolates the value of the injury that can be causally linked to a defendant’s negligence — the loss *168 of an opportunity. The value of a loss-of-opportunity claim is measured by the extent of the loss; so, clearly, the injury being compensated is the loss of a particular amount of opportunity. By contrast, the measure of damages in a traditional claim for wrongful death or physical harm is, generally speaking, the value of damages attributable to the death or physical harm; as such, the injury being compensated is the death or physical harm.
In sum, when Falcon adopted the loss-of-opportunity doctrine, it recognized that the injury of loss of an opportunity was distinct from the injury of suffering the associated physical harm — which, in that case, was death. However, Falcon indicated that not all losses of opportunity were actionable; rather, a plaintiff must suffer the loss of a substantial opportunity for a better result. “The cause of action accrues when harm and damages result from the loss of a substantial opportunity for a better result.” Id. at 470 n 43. We concluded “that loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm,” but declined to “decide what lesser percentage would constitute a substantial loss of opportunity” in other circumstances. Id. at 470.
Finally, Falcon emphasized that a loss-of-opportunity cause of action was not exempt from the more-probable-than-not standard of causation. “Under this approach, the plaintiff must establish more-probable-than-not causation. He must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm.” Id. at 462. Unlike a claim for wrongful death or physical injury, the “patient. .. need not show that it was probable, measured as more than fifty percent, that the course of the disease and treatment would have been different.” Id. at 470 n 43. Instead, “[i]t is suffi *169 cient to show, more probably than not, that had there been a correct diagnosis, the patient would have had a substantial opportunity of avoiding the course of the disease and treatment that occurred.” Id. Therefore, while a claim for loss of opportunity addresses a different injury than a cause of action for the physical injury itself, it is still subject to the same standard of proof of causation.
Falcon’s enunciation of the loss-of-opportunity doctrine is significant, because it apparently provoked the Legislature to amend MCL 600.2912a. In 1993, the Legislature amended that provision by adding a second subsection, which states:
In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. [MCL 600.2912a(2).]
The amendment was widely understood to be a direct reaction to the Falcon decision. As a majority of this Court noted, after Falcon adopted the lost-opportunity doctrine, “[o]ur Legislature immediately rejected Falcon and the lost opportunity doctrine. MCL 600.2912a(2) . . . .” Weymers v Khera, 454 Mich 639, 649; 563 NW2d 647 (1997). I agree that the amendment of MCL 600.2912a(2) was a reaction to Falcon, but I would not characterize it as a rejection of the lost-opportunity doctrine entirely. It merely established the threshold for loss-of-opportunity claims.
THE PROPER INTERPRETATION OF MCL 600.2912a(2)
The Legislature’s addition of MCL 600.2912a(2) should be read in light of the Falcon decision. This *170 Court follows the principle that when a statute uses a common-law term and there is no clear legislative intent to alter the common law, the term will be interpreted as having the same meaning as at common law. Ford Motor Co v City of Woodhaven, 475 Mich 425, 439; 716 NW2d 247 (2006). Additionally, the Legislature is presumed to be aware of judicial interpretations of existing law when passing legislation. Id. at 439-440. In this instance, the Legislature appears to have reacted to a particular opinion of this Court, so that opinion’s holdings offer considerable insight into the Legislature’s intent. When interpreting MCL 600.2912a(2), then, it is important to keep in mind several principles established by the Falcon decision: (1) loss-of-opportunity claims are subject to the more-probable-than-not standard for proving causation, (2) the “injury” in a loss-of-opportunity claim is the loss of a substantial opportunity to avoid physical harm, not the actual physical harm itself, and (3) loss of a 37.5 percent opportunity of living constitutes a compensable loss of a substantial opportunity to avoid physical harm. Chief Justice TAYLOR interprets MCL 600.2912a(2) without considering these principles from Falcon, and thus comes to the mistaken conclusion that the statute is unenforceable and inconsistent with the lost-opportunity doctrine.
The first sentence of MCL 600.2912a(2) assigns a medical-malpractice plaintiff “the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants.” Chief Justice TAYLOR concludes that this sentence precludes lost-opportunity claims because those claims only arise when a plaintiff cannot prove that a defendant’s negligence more probably than not caused the plaintiffs injury. Ante at 157. But this overlooks two principles gleaned from Falcon that the Legislature would have been aware of while drafting this sentence: loss-of-opportunity claims are *171 subject to the more-probable-than-not standard of causation and, in such claims, the “injury” is the loss of an opportunity to avoid the physical harm, not the associated physical harm itself. When the first sentence of MCL 600.2912a(2) is interpreted according to Falcon’s articulation, its causation requirement does not preclude claims for loss of opportunity. It simply codifies the causation requirement that applies to claims for the injury of suffering physical harm as well as claims for the injury of the loss of an opportunity to avoid physical harm. Just like Falcon, MCL 600.2912a(2) requires that a plaintiff asserting a cause of action for loss of opportunity prove that the defendant more probably than not caused the loss of an opportunity to survive or the loss of an opportunity to achieve a better result.
The first sentence of MCL 600.2912a(2) should also be interpreted in accordance with Falcon’s understanding of the word “injury.” In medical-malpractice cases, the underlying injury is quite often death or some physical harm. But Falcon identified a distinct injury in medical-malpractice cases — the loss of a substantial opportunity to avoid physical harm. This is significant, because a lost-opportunity plaintiff, by definition, cannot prove that a defendant’s malpractice more probably than not caused the patient to suffer physical harm or death. Take the example of a patient who before treatment had a 40 percent chance of survival as the result of a preexisting condition. If that patient died after being negligently treated by a physician, the plaintiff would not be able to prove that the physician’s malpractice more probably than not (50 percent or greater) caused the patient’s death. There was a 60 percent chance that the patient would have died regardless of the malpractice, as a result of the preexisting condition. But the plaintiff might be able to show that the physician’s malpractice more probably than not caused the *172 patient to lose up to a 40 percent chance of avoiding death.[2] The first sentence of MCL 600.2912a(2) simply places this burden to prove causation on a plaintiff, whether the alleged injury is the physical harm itself or the loss of an opportunity to avoid harm.
Moreover, the explicit recognition of the loss-of-opportunity doctrine in the second sentence of MCL 600.2912a(2) supports the conclusion that the Legislature did not intend to preclude lost-opportunity claims by adopting the more-probable-than-not standard of causation. The second sentence states: “In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.” MCL 600.2912a(2). If the Legislature had intended to reject the lost-opportunity doctrine, it would have entirely prohibited plaintiffs from recovering for a loss of an opportunity. Instead, it permitted recovery for loss of an opportunity under certain circumstances — if the opportunity was greater than 50 percent. This sentence merely sets the threshold for invoking the loss-of-opportunity doctrine. It requires that a plaintiffs premalpractice opportunity to survive or achieve a better result was greater than 50 percent.[3]
*173 The conclusion that the first and second sentences of MCL 600.2912a(2) do not conflict is also related to the proper interpretation of the second sentence. Chief Justice TAYLOR identifies an ambiguity in the second sentence that, he contends, can only be resolved by adding words or by redefining the term “injury.” Ante at 160.[4] The Court of Appeals also identified this ambiguity in Fulton v William Beaumont Hosp, 253 Mich App 70; 655 NW2d 569 (2002). Fulton described the ambiguity: the second sentence of the statute requires a plaintiff to show either that the premalpractice opportunity was greater than 50 percent or that the opportunity was reduced by more than 50 percent. Id. at 77. In short, the ambiguous term is the statute’s second use of the word “opportunity.” I disagree with the conclusion that none of the multiple, contradictory interpretations can be shown to be the correct construction of legislative intent. While reasonable minds could differ with respect to the meaning of this statute, the correct interpretation can be discerned by conventional means of construction.
The proper interpretation of the second use of the word “opportunity” in MCL 600.2912a(2) can be resolved by simply considering the entire text of the sentence. The first time “opportunity” is used, the statute speaks of recovery for “loss of an opportunity to survive.” MCL 600.2912a(2). By using this term from *174 Falcon without modification, the Legislature adopted Falcon’s articulation of the lost-opportunity cause of action. And we know from Falcon that by the very nature of a lost-opportunity claim, the opportunity alleged to have been lost must be the premalpractice opportunity. The word “opportunity” in the phrase “loss of an opportunity” must refer to the premalpractice opportunity because that is the opportunity that is lost in some measure and, thus, creates a claim.
The second time “opportunity” is used in the sentence, it is not preceded by the phrase “loss of an.” But the statute’s replication of the term “opportunity” within the same sentence clearly indicates that they relate to each other and are to be construed identically. Thus, the term “opportunity” in isolation has the same meaning that it does within the phrase “loss of an opportunity to survive.” Accordingly, a plaintiff cannot recover for the loss of an opportunity unless the opportunity — the premalpractice opportunity that was allegedly lost in some measure — was greater than 50 percent. Thus, this interpretation does not require that any words be added to the sentence; it merely requires the word “opportunity” to be construed consistently within the same sentence.
The other proposed meaning of the statute’s second use of the word “opportunity” would conflict with the sentence’s first use of the word. Instead of reading the phrase “unless the opportunity was greater than 50%” as written, this interpretation would infer the words “loss of” in front of “opportunity.” Justice MARKMAN advocates this interpretation. He concludes that “the opportunity” clearly refers back to the “loss of an opportunity,” and thus the sentence means that the loss of the opportunity must be greater than 50 percent. Post at 195. But this interpretation conflates the phrase *175 “loss of an opportunity” with the phrase “the opportunity.” It assumes that the Legislature used the phrase “the opportunity” as a shorthand reference for “loss of an opportunity” and requires the reader to infer the phrase “loss of” before the second use of the word “opportunity.” This interpretation is less plausible than my interpretation, which gives the term “opportunity” the same meaning regardless of whether it appears alone or within the phrase “loss of an opportunity,” and does not require reading language into the statute.[5] In sum, I cannot conclude that this competing interpretation is correct when it poses linguistic problems that are not found in the other interpretation.
Moreover, interpreting the word “opportunity” to mean premalpractice opportunity comports with the purpose of the statute and the context in which it was adopted, while the other interpretation does not. Falcon adopted the loss-of-opportunity doctrine to provide a cause of action to plaintiffs who could not establish causation for physical harm, but could establish causation for the loss of a substantial opportunity to avoid that physical harm. MCL 600.2912a(2) cannot limit *176 recovery for the loss of an opportunity to cases in which the loss was greater than 50 percent, because any plaintiff who satisfied that condition would have a traditional medical-malpractice claim for the death or physical harm itself.[6] A plaintiff who can show that malpractice caused the loss of a more than 50 percent opportunity to avoid death or physical harm can meet the more-probable-than-not standard of causation for the associated death or physical harm. This interpretation would permit a loss-of-opportunity claim when a *177 plaintiffs chance for survival was reduced from 80 percent to 20 percent, but not when the plaintiffs chance for survival was reduced from 80 percent to 40 percent. It would not make sense to permit a plaintiff whose chance of survival was reduced from 80 percent to 20 percent to bring a lost-opportunity claim, because that plaintiff could show that the negligence more probably than not caused the death, thus establishing a traditional wrongful-death claim. Meanwhile, the statute would deny recovery for the loss of an opportunity to a plaintiff who suffered death, but could only show that the malpractice reduced his opportunity to survive from 80 percent to 40 percent. The plaintiff in that case would be left with no cause of action at all; he could not meet the more-probable-than-not standard of causation for the injury of death, and he would be precluded from bringing a lost-opportunity claim because he lost only 40 percent of his opportunity. This cannot be the result intended by the Legislature. This interpretation of the statute would prevent Falcon's intended class of plaintiffs from bringing a loss-of-opportunity claim, while still recognizing a cause of action for loss of opportunity. It would provide a class of plaintiffs who already have a traditional medical-malpractice cause of action with an additional cause of action for loss of opportunity. Such a result is illogical in light of one significant purpose of the statute — to codify the loss-of-opportunity doctrine recognized in Falcon.
Finally, interpreting the statute as referring to the premalpractice opportunity is consistent with the history of the amendment. That is, MCL 600.2912a(2) is understood to be a legislative reaction to Falcon. MCL 600.2912a(2) retained the loss-of-opportunity doctrine, so it could not have been intended to entirely preclude the class of plaintiffs recognized by Falcon from bringing such claims; such a drastic step would be entirely at *178 odds with the rationale of the loss-of-opportunity doctrine. Rather, MCL 600.2912a(2) retained the doctrine, but set the threshold at 50 percent, so that only plaintiffs who had a greater than 50 percent premalpractice opportunity to survive or achieve a better result could bring a claim. This interpretation is the only reasonable explanation for the Legislature’s action — it aligns with the Legislature’s apparent intent to both endorse the doctrine and place a limit on it. In sum, I concur with Chief Justice TAYLOR that plaintiff in this case proved a traditional medical-malpractice claim based on his physical injuries and that the jury’s verdict should be upheld.[7] Plaintiff did not assert, or need to resort to, a claim for loss of opportunity. However, I disagree that the second sentence of MCL 600.2912a(2) is substantially incomprehensible. The correct interpre *179 tation of the second sentence can be discerned by an examination of the text of the statute. The result of this analysis is confirmed by the history of both the loss-of-opportunity doctrine and the statute. There is no internal conflict within the statute. The loss-of-opportunity doctrine is entirely consistent with the more-probable-than-not causation standard, so there is no conflict between the first and second sentences of MCL 600.2912a(2).
RESPONSE to justice markman
Justice Markman’s approach to interpreting MCL 600.2912a(2) is grounded in several faulty premises. The first is that traditional medical-malpractice cases require that there be “no question that the proper treatment would have resulted in a good outcome,” because otherwise “it cannot be proved that the improper treatment caused the bad outcome.” Post at 217. This proposition would preclude plaintiffs with preexisting conditions that might have contributed slightly to their injuries from bringing medical-malpractice claims. It would also preclude medical-malpractice claims from arising in situations in which proper medical treatment does not always succeed.[8] This proposition cannot be *180 correct. Plaintiffs alleging medical malpractice, regardless of whether they have preexisting conditions, are not required to prove that a defendant was a 100 percent cause of their injuries; they must simply prove more-probable-than-not causation. After all, traditional medical-malpractice claims are subject to the same principles of causation as other negligence claims. As Prosser & Keeton, Torts (5th ed), § 41, p 270, notes, “[w]hen a child is drowned in a swimming pool, no one can say with certainty that a lifeguard would have saved the child; but the experience of the community permits the conclusion that the absence of the guard played a significant part in the drowning.” There is no reason to treat medical-malpractice claims any differently in this regard. For example, even if an expert testified that a properly performed medical procedure will avoid a bad result 99 percent of the time, a jury could still conclude that the physician’s negligence was more probably than not the cause of the bad result. See post at 217.
Second, Justice MarkmAN’s approach suggests that the factor distinguishing a medical-malpractice claim from a lost-opportunity claim is whether there is another possible cause of an injury, such as a preexisting condition. He states:
... I conclude that a “lost opportunity” case is one in which it is at least possible that the bad outcome would have occurred even if the patient had received proper treatment. By contrast, if there is no question that the *181 proper treatment would have resulted in a good outcome, then the patient who suffered a bad outcome has a traditional medical-malpractice action. [Post at 186.]
But this definition of a lost-opportunity case is contrary to both the doctrine as described by Falcon and the doctrine as adopted by the Legislature in MCL 600.2912a(2). The distinction between a lost-opportunity case and a medical-malpractice case does not pivot on a plaintiffs preexisting condition or the absolute certainty that proper medical treatment would have prevented the harm the plaintiff suffered. Rather, the determining factor is whether the plaintiff can prove, more probably than not, that the defendant’s negligence caused physical harm. If a plaintiff can prove more-probable-than-not causation for physical harm, then he has a medical-malpractice claim for that injury. If not, he may have a claim for loss of opportunity to avoid harm, if he can prove that the defendant’s negligence caused that injury: the loss of an opportunity to avoid harm. Of course, many lost-opportunity cases arise when a plaintiff has a preexisting condition that could have caused physical harm without negligence, but this is a correlation, not a cause. The fact that a plaintiff has a preexisting condition does not, by itself, cause a claim to be a lost-opportunity claim rather than a medical-malpractice claim. Similarly, the existence of other possible causes for a bad result does not determine the cause of action available to that plaintiff. Specifically, the possibility that a patient’s disease or injury itself may have caused the bad result does not mean that the patient cannot bring a traditional medical-malpractice claim.[9] Rather, as Falcon ex *182 plained, traditional medical-malpractice claims require a plaintiff to show that the negligence more probably than not caused physical harm. Falcon, 436 Mich at 449. The Legislature adopted Falcon’s term “loss of opportunity” as well as the traditional more-probable-than-not standard of causation. Accordingly, there is no reason to conclude that the distinguishing feature between medical-malpractice claims and lost-opportunity claims is the existence of other possible causes of the harm, as Justice MARKMAN appears to posit.
These faulty suppositions are significant, because they lead Justice MARKMAN to endorse Dr. Roy Waddell’s formula for calculating loss of opportunity. Waddell’s formula purports to calculate a plaintiffs lost opportunity to survive by determining “what percent of patients who would die without treatment” could otherwise “be saved with treatment.”[10] If proper treatment creates a greater than 50 percent chance of survival within the set of patients who would have died without treatment, then a cause of action exists. But Waddell’s formula is flawed for several reasons. It operates from a mistaken understanding of a lost-opportunity case. The formula identifies plaintiffs who can show that negligence was more than a 50 percent cause of their death or physical harm. But that set of plaintiffs can, by definition, maintain a traditional cause of action for medical malpractice for the injury of death or physical harm itself. Accordingly, his formula would preclude true lost-opportunity plaintiffs from bringing claims *183 and provide medical-malpractice claimants with lost-opportunity causes of action for which they have no need. Moreover, aside from its theoretical problems, the Waddell formula is blatantly inconsistent with the language of MCL 600.2912a(2).[11] It is inconceivable that Justice MARKMAN can read the sentence “In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%” and conclude that it should be translated into this formula:
(Premalpractice chance) - (Postmalpractice chance) x 100 (Postmalpractice chance)
This formula has no basis in the language of MCL 600.2912a(2) or Falcon. MCL 600.2912a(2) simply requires that the opportunity was greater than 50 percent. Again, it is noteworthy that my interpretation does not require adding any inferred language to the statute. A plaintiffs premalpractice opportunity to survive or to achieve a better result must simply have been “greater than 50%.” The approach taken by Justice MARKMAN and Dr. Waddell requires this sentence to be rewritten to state *184 that the plaintiffs opportunity to survive or to achieve a better result must have been decreased by 50 percent. See post at 195-197.
Finally, the Waddell approach leads to such anomalous results that it cannot possibly reflect the intention of the Legislature. The Legislature crafted MCL 600.2912a(2) as a reaction to Falcon, which permitted a lost-opportunity cause of action when the plaintiffs premalpractice opportunity to survive was 37.5 percent. As Justice MARKMAN acknowledges, if a plaintiff dropped from a 99.99 percent premalpractice chance of survival to a 99.97 percent postmalpractice chance of survival, the Waddell formula would conclude that the plaintiff had experienced an actionable 66.67 percent loss of opportunity. On the other hand, recovery would be barred if a plaintiff dropped from a 60 percent premalpractice chance of survival to a 40 percent chance of survival, because the plaintiff would have experienced only a 33 percent loss of opportunity. It is unlikely that the Legislature intended to compensate a loss of just 0.02 percentage points, while simultaneously precluding a loss of 20 percentage points. It is more likely that the Legislature disagreed with the threshold limit for lost-opportunity cases established by Falcon, 37.5 percent, and amended MCL 600.2912a(2) to raise the threshold to 50 percent.
RESPONSE TO CHIEF JUSTICE TAYLOR
While we reach different interpretations of MCL 600.2912a(2), I nevertheless agree with Justice MARKMAN that Chief Justice TAYLOR errs by concluding that the second sentence of the statute is incomprehensible and unenforceable. I share Justice MARKMAN’s objection to the unprecedented approach Chief Justice TAYLOR has taken in concluding that this statute is unenforceable simply *185 because it presents a complex matter of interpretation. While the fracture of this Court on this matter certainly illustrates the difficulty of interpreting this statute, I disagree that it compels the conclusion that the statute is unenforceable. And, in fact, Chief Justice Taylor’s opinion paradoxically indicates that the statute will continue to be enforced unless the Legislature amends it, because the Fulton panel’s interpretation will remain controlling law. Ante at 164 n 14.
CONCLUSION
I disagree with Chief Justice Taylor’s conclusion that the second sentence of MCL 600.2912a(2) is incomprehensible and cannot be judicially enforced. Therefore, I respectfully disagree with his analysis of that provision. However, I agree that the jury’s verdict should be upheld, because plaintiff has presented evidence that supports a traditional medical-malpractice claim.
Weaver and Kelly, JJ., concurred with Cavanagh, J.

 Throughout this opinion, “plaintiff” refers to Carl Stone; the claim of his wife, Nancy Stone, is derivative in nature.

 MCL 600.1483.

 In addition, subsections 1(a) and (b) of the statute both include language requiring the plaintiff to show that, “as a proximate result of the defendant failing to provide [the appropriate standard of practice or care], the plaintiff suffered an injury.” MCL 600.2912a(1)(a) and (b).

 Although this Court decided Weymers long after the statute at issue was enacted in 1993, the negligence alleged in Weymers occurred before 1993. Accordingly, the Court applied the common law rather than the statute.

 I agree with Justice Cavanagh’s reasoning and conclusion that Justice Markman’s definition of a lost-opportunity case is overbroad and inconsistent with the common-law meaning at the time MCL 600.2912a(2) was enacted. Post at 179-182. Long before Falcon v Mem Hosp, 436 Mich 443; *153 462 NW2d 44 (1990), plaintiffs successfully brought actions for medical malpractice even though they had preexisting conditions or might have had a bad result despite being properly treated.

 Only Justice Archer joined Justice Levin’s lead opinion. Justice Boyle wrote a concurrence, joined by Justice Cavanagh, that agreed that tort law should allow a claim for “lost opportunity to survive” when “the negligence of the defendant more probably than not caused the loss of opportunity.” Falcon, supra at 472-473 (Boyle, J., concurring). However, the concurrence noted that “any language in the lead opinion suggesting that a similar cause of action might lie for a lost opportunity of avoiding lesser physical harm is dicta.” Id. at 473.

 While Falcon superficially recognized this, it determined that the patient’s death, which could not be said to have been caused by the *158 doctor’s malpractice, was the physical injury she suffered. By permitting the plaintiff to recover for a different injury (loss of an opportunity to survive), the Court ignored the fundamental requirement that a tort plaintiff must suffer a physical injury that was caused by the defendant’s negligence. Instead of clarifying that it was significantly redefining “injury” in a wholly new way, the lead opinion in Falcon first focused almost completely on relaxing the burden of proof regarding causation. See, e.g., Falcon, supra at 449-453 and nn 5 and 6, 455-457 (Levin, J.). Then it recited foreign cases holding that a reduction in chances is a compensable injury and determined that to be sound. Id. at 461-468. The opinion did not appear to recognize that this was contrary to a considerable body of existing Michigan caselaw. See id. at 494 (Riley, J., dissenting) (“The recovery of damages for the loss of a mere chance eviscerates the principles that underlie our tort law.”).

 Justice Cavanagh asserts that a plaintiff cannot claim a lost opportunity “unless [the] plaintiff suffered a verifiable loss.” Post at 172 n 2. Justice Makkman appears to agree with him that a bad result must occur, otherwise the opportunity has not been lost. Post at 197. Certainly, in such cases the defendant’s conduct might have increased the likelihood of a bad result. Yet if the plaintiff is unable to show that the defendant’s negligence caused the bad result, how can he or she nonetheless show that the defendant’s negligence caused the opportunity to be lost? This is the heart of the problem with allowing loss-of-opportunity claims: either the patient has a concrete injury, in which case he or she should be required to prove causation, or the plaintiff does not, in which case the defendant should not be held liable. See Henry, supra at 75-76.

 I agree with Justice Cavanagh, post at 174, that Justice Markman’s interpretation (and that of Fulton) improperly adds to the statute the words “loss of,” effectively replacing the word “opportunity” where it is used the second time with the phrase “loss of opportunity.” The only basis for adding this language is the simple desire to make the statute so read.

 See, e.g., Mini Spas, Inc v State, 657 P2d 1348, 1350 (Utah, 1983) (refusing to rewrite “by judicial intervention” an act purporting to create a regulatory hoard because the act “cannot be implemented as written” and stating that “[pjlaintiff must seek a solution to this problem from the Legislature”); Warren v Branan, 109 Ga 835, 840; 35 SE 383 (1900) (holding that the provisions of an act seeking to establish the geographical limits of a town “are so indefinite, uncertain, and incomplete that the legislative intent can not be ascertained and given effect, and that therefore the act is wholly inoperative”).

 Even if we were to strike both sentences of subsection 2, the proximate-cause requirement would remain in subsection 1.

 Moreover, to the extent it could be considered as providing a method of determining proximate cause in failure-to-diagnose cases, I believe that Fulton was incorrectly decided. Fulton’s simplistic formula fails to consider that some patients would achieve a good result regardless of whether they received proper or improper treatment and, conversely, that some patients would achieve an unfavorable result regardless of the quality of their treatment. In any formula assessing causation, patients who would have had a favorable outcome regardless of treatment need to be taken out of the equation. See, e.g., Waddell, A doctor’s view of “opportunity to survive’’: Fulton’s assumptions and math are wrong, 86 Mich B J 32 (March 2007). Accordingly, I agree with Justice Markman that Waddell’s formula is one method of accurately assessing causation in cases in which there are multiple possible contributing causes.

 I agree with Justice Markman that if the Legislature desires to allow a cause of action for lost opportunity, it should do so in a way that clearly indicates when such claims are allowed and how they should be analyzed. Post at 218 n 26. For example, Falcon’s analysis was based on a method found in King, Causation, valuation, and chance in personal injury torts involving preexisting conditions and future consequences, 90 Yale L J 1353 (1981), which identified several ways of analyzing lost-opportunity claims.

 However, because a majority of justices hold that this is not a lost-opportunity case, the issue of the correctness of Fulton cannot be reached, and Fulton’s approach remains undisturbed as the method of analyzing lost-opportunity cases. Nonetheless, because the patient in Fulton would likely have survived had she received a timely diagnosis, I would assert that the claim should have been treated as one for ordinal^ medical malpractice and that the lower courts erred in applying to it the doctrine of lost opportunity.

 Justice Levin wrote Falcon’s lead opinion, which Justice Archer signed. I joined Justice Boyle’s opinion, which concurred in the recognition of the loss-of-opportunity cause of action, but clarified that we were only called upon to determine whether such claims exist when the ultimate harm is death. Thus, a majority of this Court agreed on the *166 fundamental principles of the loss-of-opportunity doctrine, although Justice Boyle and I would have limited the discussion to the harm that the Falcon plaintiff suffered-death.

 Chief Justice Taylor’s concern that redefining “injury” in this way would permit recovery for a “lost chance alone, without proof of physical injury” is unfounded. Ante at 157. By definition, one does not suffer the loss of an opportunity to survive unless death occurs. Otherwise, there would have been no opportunity lost. Similarly, a claim for the loss of an opportunity to achieve a better result does not arise unless a plaintiff suffered a verifiable loss. The loss is the injury that the lost-opportunity doctrine recognizes. Typically, proof of an actionable loss will involve actual physical harm suffered by the plaintiff. Defining injury as such will not allow a plaintiff to recover for a potential future injury.

 For example, a patient who had a premalpractice opportunity to survive of 60 percent, and whose chance of survival was reduced to 20 *173 percent because of malpractice, would have a cause of action for loss of opportunity to survive if he ultimately died. The plaintiff in that case would not have a wrongful-death action because it was not more probable than not that the negligence caused the patient’s death. But he could have a cause of action for the loss of a 40 percent opportunity to survive, because the patient’s premalpractice opportunity to survive was greater than the threshold of 50 percent.

 I disagree with the premise that a statute is ambiguous only if it is equally susceptible to more than one meaning.

 Justice Markman denies that he reads words into the statute. Post at 195 n 10. But it is telling that Justice Markman has solved the inference problem present in his interpretation by repeatedly misquoting the statute. For example, he reports that MCL 600.2912a(2) “states that the Tost opportunity’ must be greater than 50 percent....” Post at 195 n 10. He repeats that MCL 600.2912a(2) “requires that the Tost opportunity’ be ‘greater than 50%’ ” in another portion of his opinion, post at 196, and later states that MCL 600.2912a(2) “only allows a plaintiff to recover for a Toss of an opportunity’ that was ‘greater than 50%,’ ’’post at 197. The selective positioning of these phrases artfully suggests that the statute actually says that the lost opportunity must he greater than 50 percent. But, in fact, the statute simply requires that “the opportunity was greater than 50%.” MCL 600.2912a(2) (emphasis added). The fact that Justice Markman is compelled to recharacterize the text of the statute in this way strongly suggests that his interpretation infers the word “lost” before the word “opportunity.”

 Justice Markman asserts that I am incorrect on this point because, for example, plaintiff in this case can show that he lost an 80 percent opportunity to achieve a better result (no amputation), but “cannot prove that defendant’s malpractice caused the amputation, as he would be required to do in a traditional medical-malpractice action... because there was at least a 1 percent chance that plaintiff would have suffered an amputation even with proper treatment.” Post at 214. From this argument, it would appear that Justice Markman believes that medical-malpractice actions require a plaintiff to prove that a defendant’s negligence was a 100 percent cause of his injury. However, we have explained that the element of “cause in fact” in negligence does not require a plaintiff to “prove that an act or omission was the sole catalyst for his injuries ....” Craig v Oakwood Hosp, 471 Mich 67, 87; 684 NW2d 296 (2004). Rather, a plaintiff “must introduce evidence permitting the jury to conclude that the act or omission was a cause.” Id. This is consonant with the caselaw of other jurisdictions, and holds true regardless of whether a plaintiffs preexisting condition was a possible cause of his injury. In medical-malpractice cases,
the courts have uniformly adopted the position that proof of causation does not require that it be shown that the patient was certain to have recovered or improved with sound medical care, and it has often been said that the plaintiff may sustain the burden of establishing proximate causation with evidence that it was probable, or more likely than not, that the patient would have been helped by proper treatment. [Anno: Medical malpractice-. “Loss of chance" causality, 54 ALR4th 10, 18 (emphasis added).]
The Legislature codified this position in MCL 600.2912a(2), which gives the plaintiff the burden of proving that the defendant’s negligence more probably than not proximately caused his injury.

 There was adequate evidence that the doctor’s malpractice proximately caused plaintiffs injuries. It is undisputed that plaintiffs aneurysm ruptured and that he suffered amputation of his legs as a result. The jury heard testimony that, had plaintiff been diagnosed earlier and undergone elective surgery, his chance of having complete success with no complications would have been approximately 95 percent, his chance of death would have been 1 to 5 percent, and his chance of amputation would have been 1 percent. Given the rupture, his approximate chance of complete success with no complications dropped to 5 to 10 percent, his chance of death became 60 to 90 percent, and his chance of surviving, but suffering amputation, became 5 percent. When a patient’s chance of complete success drops from 95 percent to less than 10 percent because of a doctor’s malpractice, and the patient suffers one of the natural complications, the jury’s conclusion that the malpractice proximately caused that injury is warranted. If the jury in this case could only have considered the specific risk of amputation, as Justice Makkman suggests, post at 216 n 25, plaintiff would essentially be penalized for managing to survive an event that few others do. While the risks associated with harms that were not actually suffered by a plaintiff are not relevant to the extent of a plaintiffs lost opportunity, potential risks stemming from a physician’s malpractice may be relevant to the jury’s determination of whether malpractice caused a plaintiff to suffer a particular harm rather than achieve a good result.

 Justice Markman cites no authority for the proposition that a plaintiff may only recover for traditional medical malpractice if proper treatment would not have resulted in the bad result suffered by the plaintiff. If true, that principle would foreclose virtually all traditional medical-malpractice cases. With almost any medical procedure, there is a statistical probability that a patient will experience a bad result, even if the procedure is performed properly. As just one example, the Food and Drug Administration (FDA) counsels patients considering LASIK eye surgery that while “[m]ost patients are very pleased with the results of their refractive surgery!,] • • • like any other medical procedure, there are risks involved.” Food and Drug Administration, Center for Devices and Radiological Health <http://www.fda.gov/cdrh/LASIK/risks.htm> (accessed July 2, 2008). The FDA advises that the risks of LASIK surgery include *180 loss of vision, debilitating visual symptoms, and severe dry eye syndrome. Id. In sum, “[t]here are never any guarantees in medicine.” Id. Within the realm of eye surgery alone, Justice Makkman’s rule would mean that any LASIK patient who experienced a loss of vision, debilitating visual symptoms, or severe dry eye syndrome would not be able to bring a traditional medical-malpractice claim simply because there was a chance, however slight, that those conditions would have occurred as a result of the properly performed LASIK procedure itself.

 Justice Makkman offers the hypothetical treatment of a broken leg to show that his theory of traditional medical-malpractice claims is consistent with traditional causation principles. But he indicates just the *182 opposite, by precluding a medical-malpractice claim unless administering proper treatment would never produce permanent damage. Assuming that a patient was treated, this requirement eliminates the possibility that another force (such as the natural progression of the broken leg itself), rather than negligence, caused the permanent damage to the leg.

 Waddell, A doctor’s view of “opportunity to survive”: Fulton’s assumptions and math are wrong, 86 Mich B J 32, 33 (March 2007).

 Justice Maekman opines that in the matter of MCL 600.2912a(2), “there is quite likely some disconnection between what the Legislature may have had in mind and what it actually enacted.” Post at 198 n 15. Yet, despite appearing to believe that the Legislature’s intent may not correlate to the words of MCL 600.2912a(2), Justice Maekman is nevertheless convinced that he can discern the Legislature’s intent from the statutory language. Further, he argues that the Waddell formula is consistent with the statutory language, even while conceding that the Legislature may not have had the concept that was later embodied in Waddell’s formula specifically in mind when it enacted MCL 600.2912a(2). I think it is more than merely possible that the Legislature did not have this concept in mind when it crafted this law; notably, Waddell’s article was not even published until 2007, long after the Legislature amended MCL 600.2912a(2) in 1993.