# STATE OF MICHIGAN

# COURT OF APPEALS

CORESOURCE, INC.,

Plaintiff-Appellant,

v

METALDYNE, L.L.C.,

Defendant-Appellee.

UNPUBLISHED
December 11, 2018

No. 341996
Oakland Circuit Court
LC No. 2017-157768-CB

Before: GLEICHER, P.J., and BORRELLO and BECKERING, JJ.

PER CURIAM.

Metaldyne, LLC hired CoreSource Inc.'s predecessor to administer and manage its self-funded employee benefit plans, with fees to be paid on a per capita basis. The contract did not require Metaldyne to maintain minimum participation in the plans nor did it limit Metaldyne's right to discontinue the plans identified in an appendix to the contract. Accordingly, the circuit court properly determined that Metaldyne had not breached the contract and dismissed CoreSource's lawsuit. We affirm.

## I. BACKGROUND

In 2009, Metaldyne contracted with NGS American, Inc. to "assist . . . in the administrative tasks of enrollment, eligibility, billing and certain other services" and to "serve . . . as the Administrator" of 13 employee benefit plans, including medical, dental, and disability plans. Effective January 1, 2016, NGS assigned its duties under the Administrative Services Agreement (ASA) to CoreSource, with Metaldyne's consent. Also effective January 1, 2016, the parties agreed to new a contractual term extending until December 31, 2017. In exchange for NGS's and then CoreSource's services under the ASA, Metaldyne paid monthly "[s]ervice fees . . . based on the number of employees and retirees" covered under Metaldyne's 13 benefit plans listed in Appendix B of the contract.

The ASA specifically provided, in relevant part:

WHEREAS, NGS, under the terms of this [ASA], shall assist [Metaldyne] in the administrative tasks of enrollment, eligibility, billing and certain other services as set forth in Appendix A of this [ASA] under Each Plan and the services agreed to in the Request for Proposal (RFP) included as Appendix C.

-1-

**SECTION 4   DUTIES AND RESPONSIBILITIES OF [METALDYNE]**

4.01   Preparation of Eligibility List and Plan Information.

A.      [Metaldyne] shall prepare complete rate information for all plans; such records must be delivered to NGS sixty (60) days prior to the date of change.  [Metaldyne] shall provide enrollment records for all participants and shall promptly update these records by notifying NGS of changes in Participant status (including the addition of new Participants, termination or layoff, or any other changes known to [Metaldyne] that may affect the eligibility of a Participant) . . . .

* * *

D.      [Metaldyne] shall provide NGS, within sixty (60) days prior to the original effective date or the effective date of any change, with certain information in a form and manner specified by NGS; such information may include, but shall not be limited to: (1) eligibility criteria under the Plan(s) . . . .

4.02   Funding

* * *

F.      [Metaldyne] acknowledges that in the event a Plan or Plan(s) are discontinued or canceled, or in the event of the termination of this [ASA], [Metaldyne] remains responsible for funding all Plan expenses incurred prior to the date of such discontinuance, cancellation or termination. While [Metaldyne] retains the obligation to pay expenses incurred prior to the date on which the Plan is discontinued, canceled or terminated, or this [ASA] is terminated, NGS will cooperate in arranging to process payment for such expenses after such date under the terms and conditions as mutually agreed to by the parties.

* * *

**SECTION 5   RELATIONSHIP OF THE PARTIES**

5.01   Independent Contractors.  In performing services under this [ASA], NGS performs all acts as an independent contractor. . . .

* * *

**SECTION 7   TERMS AND TERMINATION**

* * *

7.03    Termination.   This [ASA] may be discontinued at the earliest time specified below:

A.    By either party, with or without cause, upon written notice given at any time prior to a date which is sixty (60) days before the expiration of the then current term of the [ASA].  The notice shall indicate an intention to terminate at the expiration of the then current term, and the [ASA] shall terminate at the end of that term and not be renewed.

B.    By [Metaldyne], at any time, with sixty (60) days notice, providing notice to NGS that [Metaldyne] believes NGS has committed a material breach of the [ASA]. . . .

\* \* \*

7.04    Continuing Obligations after Contract Termination.   Notwithstanding the termination of the [ASA], the following rights and liabilities of the parties shall survive for the specified time period following termination:

A.    [Metaldyne's] duty to pay NGS, pursuant to Sections 2.02 [project fees], 7.07 [outstanding fees], 9.03, 9.04 [service fees] and 11.14 [taxes], until such amounts are paid in full for expenses incurred up through termination date.

B.    [Metaldyne's] duty, pursuant to Section 4.02, to fund plan expenses incurred before the termination date until expenses are finally resolved.

C.    [Metaldyne's] and NGS'[s] duties and liabilities under Section 7.05 [record treatment], if applicable.

D.    [Metaldyne's] and NGS'[s] indemnification duties and liabilities under Sections 8.01 and 8.02 with respect to events and claims arising before the termination of the [ASA] until the appropriate statute of limitations has run.

E.    [Metaldyne's] and NGS'[s] termination obligations under all applicable Addendums to this [ASA] until the appropriate statute of limitations have [sic] run.

F.    NGS'[s] duties under Sections 7.05 [records] and 7.08 [cooperation with successor] until those duties have been performed to the reasonable satisfaction of [Metaldyne].

G.    The parties' confidentiality obligations under Sections [sic] 11.04.

\* \* \*

## SECTION 8   INDEMNIFICATIONS AND ADJUSTMENT

8.01   Indemnification Obligations of [Metaldyne]. [Metaldyne] agrees to indemnify and defend NGS . . . and to hold them harmless from, any and all claims, demands, causes of action, liabilities (absolute, accrued, contingent or otherwise), costs, losses, penalties, assessments, damages, judgments, arbitration awards, settlements or expenses (including reasonable attorney and accountant fees) which may be paid or incurred by NGS with respect to any Participant or any other person or persons (including any governmental authority) resulting from or in connection with the operation of the Plan . . ., any action or inaction by [Metaldyne] with respect to the Plan, any act or omission by NGS with respect to its duties under this [ASA], or any failure by the drawee bank to honor any payment by reason of the inadequacy of funds in the account, unless such claim, liability, cost, loss, expense, damage, penalty, assessment, judgment, arbitration award or settlement results from NGS'[s] gross negligence, willful misconduct or fraud.

* * *

## SECTION 9   SERVICE FEES

9.01   Fees. [Metaldyne] shall compensate NGS for services rendered under this [ASA] as set forth in Appendix A, which is attached to and is made a part of this [ASA].

9.02   Calculation of Fees. Service fees shall be determined on a monthly basis, based on the number of employees and retirees, if applicable, for which computerized records are maintained by NGS and other services shown in Appendix A. . . .

9.03   Monthly Billing. NGS shall send a monthly invoice to [Metaldyne]. . . . Such invoice will be for services to be performed in the month next following the invoice.   All other services which NGS provides will be billed for services rendered during the month immediately preceding the month in which the invoice is dated.   Where NGS'[s] fees are based on the number of covered individuals, the number of covered individuals will be determined as of the last day of the month immediately prior to the month in which the invoice is dated. . . .

* * *

## SECTION 11 OTHER IMPORTANT PROVISIONS

11.01 Amendments.   This [ASA] may not be amended without the express written consent of both parties.

* * *

11.07 Entire Agreement. The entire agreement between the parties concerning the subject matter hereof is incorporated into this document (including all applicable Appendices, Addenda, Exhibits or other attachments).   Upon

execution, each Addendum shall become part of this [ASA] and is to be read and understood as an integral part of the entire [ASA]. . . .

On August 11, 2016, Metaldyne notified CoreSource that it had decided to terminate the 13 plans, resulting in their relationship coming to an early end:

> Following up on our conversation yesterday regarding the termination of the CoreSource/Metaldyne [ASA]. . . . As we have previously discussed in prior conversations dating back to the inception of the agreement, while the contract term may be for a period of time, Metaldyne could cease services from CoreSource prior to the term end date without additional payment or penalty and as services are no longer rendered, there would be no fees. CoreSource has indicated that they will not terminate the [ASA] prior to December 31, 2017 even though Metaldyne has communicated that they will be ending services December 31, 2016. Since Metaldyne has no obligation to use CoreSource for services and fees are tied to services, what fees does CoreSource believe it would be entitled to after 12/31/16?

CoreSource reviewed the ASA and found "no language that supports an early termination without penalty." Accordingly, "CoreSource expect[ed] to be reimbursed for the per employee/per month fees for 2017." Metaldyne retorted, "But it is contemplated that covered employees as of 1/1/17 will be 0." CoreSource indicated its intent to rely on 2016 counts for 2017.

On October 3, 2016, CoreSource officially notified Metaldyne that it viewed Metaldyne's position—"that if there is no eligibility data going to CoreSource, then there are no services that can be provided by CoreSource"—as "a breach of the terms of the [ASA] by Metaldyne." CoreSource contended that Metaldyne had a duty to continue providing participant information through the end date of the contract term. CoreSource characterized Metaldyne's attempt to zero out employee participation in the subject plans as an unauthorized unilateral modification of the contract.

Metaldyne agreed that the ASA "term continues until December 31, 2017," but did not concede that its intended actions amounted to a breach or that it was required to continue paying CoreSource:

> We agree that Section 4.01(A) of the [ASA] requires Metaldyne to send CoreSource Plan participant enrollment records and to promptly update those Plan participant records for eligibility changes. We also agree that Section 9.03 of the [ASA] entitles CoreSource to send a monthly invoice to Metaldyne based on the number of covered individuals under the Plan as of the last day of the month immediately prior to the month in which the invoice is dated.

> The [ASA] defines the "Plan" as the Metaldyne Plans listed on Appendix B to the [ASA]. Although "covered individuals" is not defined in the [ASA], under past practices "covered individuals" has included the covered employees,

opt-out employees, and enrolled members referenced in Appendix A for calculating the monthly service fees.

> Metaldyne will be terminating the Metaldyne Plans listed on Appendix B as of December 31, 2016, so there will be no covered individuals under any of the Metaldyne Plans as of January 1, 2017. Metaldyne Performance Group, the parent company of Metaldyne LLC, is establishing a new consolidated welfare benefit plan that will cover employees of Metaldyne LLC, Grede, and HHI Holdings. All welfare benefits provided to Metaldyne employees will be offered through the consolidated MPG welfare benefit plan effective January 1, 2017. Once the Metaldyne Plans listed on Appendix B are terminated effective December 31, 2016 and there are no covered employees under those Plans, there will be no participant eligibility data to send to CoreSource.

> Under Section 9.03 of the [ASA] and the current Appendix A, the number of covered individuals under the Plan as of December 31, 2016 will be used to calculate the monthly invoice for January 2017. Beginning January 1, 2017, the number of covered individuals under the Plan will be zero, so the monthly invoices for February through December 2017 will also be $0.

> We did not find anything in the [ASA] entitling CoreSource to monthly service fees when the number of covered individuals under the Plans listed on Appendix B is zero.

CoreSource interpreted Metaldyne's termination of the benefit plans underlying the ASA, and specifically listed in Appendix B, as a unilateral amendment of the ASA in violation of § 11.01. Section 11.07 of the ASA incorporated the various appendices into the contract itself; by eliminating the plans listed in Appendix B, CoreSource contended, Metaldyne amended the contract. This was "an end-run around" Metaldyne's contractual obligations, CoreSource asserted. If the ASA did somehow allow Metaldyne to unilaterally eliminate the plans underlying the ASA, "this would render the agreed-upon duration of the [ASA] meaningless." CoreSource further argued that Metaldyne was not permitted "to render the performance under [the ASA] impossible, and then declare that its contractual obligations are excused." "A claim that a contract's terms are impossible to fulfill will not stand when the alleged impossibility is the result of circumstances within a party's complete control. Metaldyne is making a deliberate choice to unilaterally amend Appendix B." CoreSource also pointed to indemnification provisions in the ASA, requiring Metaldyne to compensate CoreSource "for losses and damages," such as those that would be caused by Metaldyne's early ending of its contractual payments.

On December 12, 2016, CoreSource sent Metaldyne an invoice for services to be rendered in January 2017, totaling $20,063.82. Metaldyne paid the bill but advised, "This reflects the last payment due." CoreSource responded with a "final demand that Metaldyne, LLC reverse its position and confirm that it agrees to abide by the terms of the [ASA], including paying the remaining invoices under the [ASA]." Absent such confirmation, CoreSource stated its intent to file suit. CoreSource reiterated that "the termination of the Plans, which will unilaterally remove them from Appendix B of the [ASA], does not excuse Metaldyne's

continued obligations under the [ASA]." CoreSource insisted that Metaldyne could not "unilaterally amend the [ASA] by eliminating the Plans in Appendix B of the [ASA] and expect to avoid its remaining obligations through December 31, 2017." CoreSource clarified its position on the impossibility of performance suggested by Metaldyne:

> Moreover, Metaldyne would not have a valid defense of impossibility of performance to a breach of contract claim by CoreSource, Inc. It is well established that "[a] contracting party is not discharged from a duty to perform under a contract if its own act renders performance impossible." 17A Am. Jur. 2d Contracts § 648. An impossibility of performance defense to a breach of contract action only "applies 'in the event that unanticipated circumstances beyond the contemplation of the contracting minds and beyond their immediate control make strict performance impossible.' " [*Rock Constr, Inc v Onyebuchi*, unpublished per curiam opinion of the Court of Appeals, issued May 25, 2001 (Docket No. 222503]. Any purported impossibility of Metaldyne, LLC to perform its remaining obligations under the [ASA] through December 31, 2017 was rendered by its own actions, and cannot be used to avoid Metaldyne, LLC's remaining allegations.

Metaldyne did not pay its invoice for February 2017. CoreSource filed suit on March 10, 2017, and filed an amended complaint on July 21. CoreSource cited §§ 9.02 and 9.03 of the ASA, requiring Metaldyne to pay monthly service fees to CoreSource based on the number of participants in its benefit plans. Through Appendix A, Metaldyne was required to pay monthly for "outsourced benefits administration fees" tied to the number of participants through December 31, 2017. CoreSource continued that Metaldyne was not permitted to unilaterally amend the ASA pursuant to § 11.01 and that the list of covered plans was included in the ASA through Appendix B according to § 11.07. CoreSource also cited § 8.01 of the ASA, which required Metaldyne to indemnify CoreSource for its damages.

CoreSource complained that despite the provisions of the ASA, Metaldyne notified CoreSource that it would terminate the contract effective December 31, 2016 (a full year early) because it was going to remove all participants from the covered plans. This was a unilateral amendment of the contract. And Metaldyne paid CoreSource only through January 2017. Accordingly, CoreSource accused Metaldyne of breaching their contract and of anticipatory breach of the contract through December 31, 2017. CoreSource sought indemnification in the amount of the fees it would have earned based on the 2016 participation numbers through the end of the contract term. CoreSource also sought a declaratory judgment regarding the parties' rights and obligations.

The parties subsequently filed competing motions for summary disposition. Metaldyne sought summary disposition under MCR 2.116(C)(8) and (10), contending that the ASA provided for payment of service fees based on the number of participants covered by the Appendix B plans but "did not provide for a minimum number of Metaldyne employees to be enrolled" or "a base amount for NGS/Core[S]ource to be paid." Metaldyne further noted that the ASA did not require Metaldyne to use CoreSource as its sole benefits administrator; rather, CoreSource was the sole administrator as to the plans listed in Appendix B. Metaldyne alone was responsible for setting eligibility criteria, including criteria that would modify the number of

employees eligible for the plans listed in Appendix B. The ASA required Metaldyne to notify CoreSource of significant plan changes within 60 days, and Metaldyne more than met that goal. And contrary to CoreSource's complaint, Metaldyne did not terminate the ASA before the end of the contractual term. The ASA remains in place but there are no longer any participants in the plans for CoreSource to provide. Section 4.02(F) specifically contemplates that Metaldyne could discontinue the plans in Appendix B while not terminating the contract, Metaldyne insisted. Given the circumstances, CoreSource could establish no damages; as there were no more covered employees, CoreSource could not calculate the service fees to which it would be entitled in 2017. Accordingly, Metaldyne contended that it did not breach the contract and had no duty to continue paying CoreSource. Instead, CoreSource was trying to rewrite the contract to require Metaldyne to provide employees for the benefit plans listed in Appendix B.

CoreSource sought summary disposition under MCR 2.116(C)(10), contending that Metaldyne breached the ASA by unilaterally amending it to eliminate the plans listed in Appendix B and thereby making CoreSource's performance impossible.

Essentially, CoreSource and Metaldyne disagreed regarding the meaning of the contractual language and what it permitted. They agreed to have the circuit court consider their competing motions without oral argument. The circuit court, Judge Wendy Potts presiding, granted summary disposition in Metaldyne's favor, citing MCR 2.116(C)(8). After quoting the most relevant contractual provisions, the court ruled:

> The ASA does not provide for a minimum number of Metaldyne employees to be enrolled or covered by any of the 13 plans governed by the ASA. It further does not provide a base amount for NGS or CoreSource to be paid under the ASA. Sections 4.01(A) and 4.01(D) allow for Metaldyne to determine eligibility criteria under the 13 plans. There is no question that Metaldyne was expressly permitted to determine the eligibility criteria pursuant to the ASA. . . .

> On October 31, 2016, in accordance with the terms of the ASA, Metaldyne notified CoreSource that it would be terminating the Metaldyne Plans listed in Appendix B as of December 31, 2016, so there would be no covered individuals under any of the plans as of January 1, 2017. Metaldyne's position now is that once there were no covered employees under those plans, then there would be no participant eligibility data to send to CoreSource. If the number of covered individuals under the plan would be zero, then the monthly invoices would also be $0. The Court agrees with Metaldyne.

> . . . Metaldyne's actions were expressly permitted by the ASA. To accept CoreSource's arguments, the Court would have to ignore the well-established rules of contractual interpretation. Sections 4.01, 9.02, and 9.03 of the ASA are clear and will be construed and enforced as written. . . . The evidence attached to Metaldyne's motion shows that on August 11, 2016, pursuant to Section 4.01 of the ASA, it informed CoreSource that the number of eligible participants in the subject ASA plans would be zero beginning on January 1, 2017. Although [CoreSource] now claims to be dissatisfied with Metaldyne's course of conduct, if NGS/CoreSource desired the Appendix B plans to be the exclusive employment

benefit plans to be used by Metaldyne, then it should have bargained for the same. [NGS/CoreSource] could have, and appears it should have, negotiated for what it now argues should be prohibited by the ASA.

Section 4.02(F) contemplates cancelation of the plans separate from termination of the agreement. Under such a circumstance, Metaldyne would be responsible for payment of expenses incurred prior to the date of the discontinuance of the plans. Since the parties agree that Metaldyne has complied with its service fee obligation due under the ASA through January 2017, there is no remaining issue for the Court to resolve.

CoreSource now appeals.

## II. ANALYSIS

As stated in *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013) (cleaned up)[1]:

We review a trial court's decision on a motion for summary disposition de novo. A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone to determine if the opposing party has stated a claim for which relief can be granted. We must accept all well-pleaded allegations as true and construe them in the light most favorable to the nonmoving party. The motion should be granted only if no factual development could possibly justify recovery.

However, the circuit court also considered the evidence submitted by the parties in making its ruling. Accordingly, the motion was instead granted pursuant to MCR 2.116(C)(10). See *Haynes v Beulah Village*, 308 Mich App 465, 467; 865 NW2d 923 (2014).

A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher*, 300 Mich App at 139-140 (cleaned up).]

---

[1] This opinion uses the new parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, Cleaning Up Quotations, 18 J App Pract & Process 143 (2017).

We also review de novo a lower court's interpretation of a contract. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). "In interpreting a contract, our obligation is to determine the intent of the contracting parties. If the language of the contract is unambiguous, we construe and enforce the contract as written. Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law." *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). A contract is deemed ambiguous if its language is "equally susceptible to more than a single meaning," *Stone v Williamson*, 482 Mich 144, 150-151; 753 NW2d 106 (2008), or when two contractual provisions "irreconcilably conflict with each other." *Klapp*, 468 Mich at 467.

The circuit court hung its hat on § 4.02(F) of the ASA. Section 4.02 generally pertains to "funding" and contemplates that "a Plan or Plan(s)" that are subject to the ASA might be "discontinued or canceled." In that event, Metaldyne would "retain[] the obligation to pay expenses incurred prior to the date on which the Plan is discontinued." ASA, § 4.02(F). The "service fees" sought by CoreSource are not synonymous with "expenses." "Expenses" are explained and covered by § 4.02. Section 4.02(A) provides that Metaldyne "shall be solely responsible for funding the expenses under the Plan." These "plan related expenses" are deposited by CoreSource into "a non-interest bearing bank account" dedicated to Metaldyne's plans. ASA, § 4.02(B). CoreSource uses that account "for the payment of benefits under" the plans. ASA, § 4.02(C). Section 4.02(D) provides that CoreSource will "notify [Metaldyne] monthly of the funds required to satisfy the Plan's expense obligations" and Metaldyne "recognize[d] its responsibility to fund Plan expenses" in § 4.02(E). Based on the first five provisions of § 4.02, "expenses" are the funds for the benefits that Metaldyne is required to pay out on behalf of its covered employees and that Metaldyne therefore must maintain in its benefit plan bank account. This is separate and distinct from service fees Metaldyne must pay to CoreSource to administer the benefit plans. Accordingly, subsection (F) eliminates Metaldyne's duty to deposit funds into its benefit plan bank accounts in the event the subject plans no longer exist. Nevertheless, the first clause of § 4.02(F)—"[Metaldyne] acknowledges that in the event a Plan or Plan(s) are discontinued or canceled"—expressly recognizes the possibility that the benefit plans serviced under the contract could be eliminated separate from the contract.

The circuit court was otherwise correct in its assessment that Metaldyne did not breach the ASA. First and foremost, Metaldyne made no promise in the ASA to provide a minimum number of plan participants, to demand a minimum level of work from CoreSource, or to continue participation in any of the Appendix B plans. Absent a promise, there can be no breach.

Moreover, the circuit court correctly posited that NGS/CoreSource should have negotiated better terms if it wanted the sought-after protection. It is black letter law that "plan sponsors," like Metaldyne, "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp v Schoonejongen*, 514 US 73, 78; 115 S Ct 1223; 131 L Ed 2d 94 (1995). And plan sponsors have been likened to trust settlors. "This is because the act of terminating a plan and the subsequent cessation of its funding cannot possibly be an act of plan management or administration under the definition of an ERISA fiduciary. Likewise, if there are no more plan assets (e.g., no more funds in the Trust bank account), there can no longer be any management or disposition of such assets." *Trigon Ins Co v Columbia Naples Capital, LLC*, 235 F Supp 2d 495, 505 (ED VA, 2002) (cleaned up). NGS and CoreSource, as professional administrators of employer-provided benefit and welfare plans,

should have been aware of these principles. To ensure continuing work and payment, NGS/CoreSource should have negotiated for minimum participation requirements or minimum plan maintenance. It did not do so. Metaldyne was within its legal right to cancel the welfare plans provided to its employees, and CoreSource can point to no promise in the contract that Metaldyne would refrain from doing so.

The reduction of plan eligibility also cannot be characterized as an amendment to the ASA. As noted by the circuit court, multiple provisions of the ASA give Metaldyne sole authority to determine eligibility for the Appendix B benefit plans—§ 2.01, § 3.01(A), and § 4.01(D). No provision of the ASA requires minimum eligibility requirements or minimum plan membership. Metaldyne therefore acted within the limits of the ASA when it reduced plan membership to zero; its conduct did not modify or amend the agreement. Further, reduction in participant numbers or elimination of benefit plans listed in Appendix B is not in the nature of an amendment. An amendment is a revision to a contract, a rewriting of a contractual clause or provision. Metaldyne did not alter the substance of the contract and as such did not violate § 11.01 of the ASA.

Further support for the propriety of Metaldyne's actions is found in § 7.04, governing the parties' continuing obligations following the termination of the contract. This section of the ASA demonstrates that termination of the ASA is something separate and distinct from the rights and liabilities of the parties pertaining to the underlying plans. This section outlines seven duties and liabilities to fund and manage the plans that outlive the termination of the ASA, ensuring the smooth operation and solvency of the plans. The inverse of this provision is that the plans are separate and distinct from the ASA, and the duties and liabilities under the plans can be terminated while leaving the ASA in place. This is just what Metaldyne did.

Ultimately, the ASA does not include the promises and guarantees advocated by CoreSource. CoreSource is a sophisticated commercial entity that should have had expert knowledge of the law impacting its role as a third-party benefit plan administrator and contracted accordingly. The language of this contract did not prevent Metaldyne's actions and the circuit court properly dismissed CoreSource's suit.

We affirm. Metaldyne, as the prevailing party, may tax its costs pursuant to MCR 7.219(A).

/s/ Elizabeth L. Gleicher
/s/ Stephen L. Borrello
/s/ Jane M. Beckering

-11-